State vs. Baum.

---

No. 13,133.

STATE OF LOUISIANA VS. WILLIE BAUM.

SYLLABUS.

1   To justify an appellate court in reversing the action of the trial judge in refusing to grant a new trial, parties complaining have to make a very strong showing.

2.  When the special charges which a defendant asks the trial court to submit to the jury contain an exposition of the law which is correct, but only under a special state of facts and with direct reference to such facts, the court correctly refuses to submit them unless prefaced by a recital of the particular conditions which would make them correct.

The trial judge has the right but is not forced to modify, limit or qualify special charges tendered him so as to make them applicable to the particular case before the court.   (State vs. Jackson, 35th Ann., 769 ; State vs. Riculfi, 35th Ann., 770 ; State vs. West, 45th Ann., 19.)

3.   When an appellant complains of the ruling of the trial judge refusing to permit him to introduce testimony as to the reputation of the deceased for peace and quiet and submits a particular act done by the deceased at the time of the homicide as evidence of an overt act of dangerous intentions, the act must either be one of such character as would *per se* be indicative thereof, or it must be shown affirmatively to have been done under circum stances such as to have reasonably led to a belief that it was of that char acter.

4.   The refusal of a trial court to permit an answer to be given to a question propounded by an accused to a witness as to the reputation of the deceased for peace and quiet is not reversible error unless there be evidence some- where, tending to show that an answer to the question would have been favorable to the defense.

5.   The refusal of a trial court to continue a case to afford the defendant an opportunity to obtain the testimony of a witness whom the sheriff has de- clared in his return on a subpoena to be a fugitive from justice, is not re versible error where there is no evidence to show where the witness was or where he would be likely to be found in the future.   Cases cannot be con- tinued upon the bare possibility that a witness may at some uncertain time in the future be found and produced.

6.   Where a sheriff in his return on a subpoena recites that the witness sought for was "a fugitive from justice," without reciting the facts and circum- stances on which that statement was based, the regular course is to have the court require him to amend his return and give details.

The return does not carry such force as to cut off parties interested from disproving, if they can, the facts therein stated.   If the privilege of doing so be refused to the prisoner on a motion to "traverse the sheriff's return," he should attempt to prove the actual facts on an application for a new trial.

O N APPEAL from the Twelfth Judicial District Court for the Parish of Calcasieu.   *Read, J.*

*M. J. Cunningham,* Attorney General, and *D. B. Gorham,* Acting District Attorney, for Plaintiff and Appellee.

*Paul A. Sompayrac* for Defendant and Appellant.

Submitted on briefs May 6, 1899.
Opinion handed down May 15, 1899.
Rehearing refused May 29, 1899.

The opinion of the court was delivered by

NICHOLLS, C. J.   A regular session of the District Court for Calcasieu parish opened on the 7th of February, 1899.

On the 10th the grand jury returned a true bill against defendant charging him with murder.

He was arraigned on the 6th of March following, and tried on the 10th.   The jury returned a verdict of guilty without capital punishment, and upon that verdict he was sentenced to the penitentiary for life.

He appealed.

On the 10th of March, the day fixed for trial, he applied through a petition supported by his affidavit for a continuance for a reasonable time, or until the next term of court.

In the petition he averred he had exercised great diligence in endeavoring to prepare for trial, but that he was not then ready, and to force him to trial would be a great injustice, as his principal witness, one Dan Johnson, was not present.

That he had exercised all diligence possible to have said Johnson present.   That it was important and indispensable that he should be present, as he expected to prove by him that he, defendant, was leaving the saloon in which Charvey Pujo, the deceased, was killed. That Pujo called him; that he went peaceably to him when he grabbed defendant and cut him.

That defendant was in great danger of suffering great bodily harm when he shot the deceased.

That he knew of no other witness by whom he could prove the said facts; that he should be allowed a reasonable time to find said Johnson.

That a continuance to the next regular term could not possibly operate to the injury of the State, whereas to force defendant to trial, without the presence of Johnson, would be to operate to the greatest possible injury of defendant.

That he had only known within the last few days that Johnson could not be found by the sheriff of Calcasieu.

That he had hoped to have Johnson present on the next day for which the case would be fixed for trial.

On the same day he filed a supplemental verified application in which he averred that a summons for Johnson had issued on the 6th of March, 1899; that to the best of affiant's knowledge Johnson had al-

ways resided in Calcasieu parish, and that he did not then know whether Johnson was residing in said parish or not.

The record shows that a subpœna for Johnson was issued by the District Court on the 6th of March, commanding him to appear at court on the 10th.

This subpœna was placed in the hands of the sheriff on the 7th, and he, on the same day, made return that Johnson was a fugitive from justice and therefore service could not be made on him.

Defendant asked the court to permit him to traverse this return and, the application being refused, he reserved a bill.

The court overruled the application for a continuance, to which ruling a bill was also reserved.

The reason assigned by the court for .refusing permission to traverse the return was that it was irregular to do so, and, further, because whether the facts shown by the sheriff's return were true or not the application was essentially insufficient.

No written application for traverse appears in the record, nor are the grounds thereof recited in the bill.

It was, doubtless, a verbal application.

The reasons assigned by the court for refusing the continuance· were that the application was essentially insufficient; it is stated conclusions rather than facts to be testified to by the witness; it failed to show that he expected to secure witness by any future day; it failed to show that witness' absence was not with the consent, procurement, or contrivance, of accused; it failed to show that delay was asked for· only that justice might be done, etc.

On the trial of the cause defendant asked one Talbert Frazier, a· witness for the State, "whether he knew the general reputation Charvey Pujo (the deceased) bore for peace and quiet in the community in which he lived?"

The court, on objection made, refused to allow the question to be· asked, assigning as its reason for so doing that "no evidence had been introduced tending to show that accused had ever been in imminent (or even remote) peril, or serious bodily harm, from deceased (or· otherwise)."

In support of his bill defendant annexed thereto the stenographer's: notes of the testimony of Talbert, given on his cross-examination just prior to having been asked the question which was objected to.

His testimony was as follows:

"Q. What is the first thing you saw Charvey Pujo (deceased) or this defendant, Willie Baum, make?

"A. I saw Charvey Pujo make the first move; jumping off the pool table, he grabbed Willie Baum around the neck and then Will Baum ducked out from under his arm and shoved him down and said: 'You son of a bitch, I'll kill you,' and he went back in his pocket and got his gun and shot him; then Charvey begged him not to shoot him any more, and he shot him again. When he shot him again he said: 'You son of a bitch, I'll kill you,' and backed out of the door."

"Q. Do you know the general reputation of Charvey Pujo for peace and quiet in the community in which he lived?"

"Objected to on the ground that no overt act or hostile demonstration has been shown of such a character as to induce the accused to believe that at the time of the killing he was in imminent peril of his life, or about to receive great bodily harm, and that until such foundation is laid all evidence as to previous character, or threats et cetera, are inadmissible.

Objection sustained; the accused reserves his bill of exceptions."

Defendant complains in a bill of exceptions to the refusal of the court to submit, at his request, the following special charges to the jury:

"If you find that the killing was done under the heat of passion, your verdict should be guilty of manslaughter."

"If you find that the accused had reason to believe that he was in danger of bodily harm, and killed the deceased under that belief, you should acquit."

The court assigned as its reasons for refusal that "neither clause sets forth the law in its fullness, as heat of passion should *itself* be excusable in order to mitigate, while unprovoked 'heat' tends to aggravate, rather than mitigate."

And however great or convincing the grounds accused might have had that he was in serious peril, yet the killing should not be excused unless the jury should also find, with proper application of the law with regard to reasonable doubts, that the peril was imminently impending and secure retreat to a place of safety was not apparent. Therefore the charges were misleading as to the law.

Defendant applied for a new trial, which the court refused.

The application was based upon the allegation that he had newly

discovered evidence which was not made known to him before his trial, but only after his conviction; that it was important and material, as it would show that Strauss and Frazier, the two principal witnesses of the State in the case, had made statements to one Cullen which differed widely from the testimony which they gave on the witness stand, and which showed that the witnesses were wholly unreliable and unworthy of belief.

In his application defendant made a detailed recital of what the statements so made to Cullen were.

Cullen's affidavit, annexed to defendant's bill, was simply to the effect that acting in his capacity of reporter of the Lake Charles Daily Press, he had questioned Strauss on or about the 28th of October, 1898, with reference to the killing of Pujo.

That he heard said witness testify on the trial of the defendant for said killing; that the testimony of said witness was widely different from his statements to him, especially with reference to the relative positions of the two men, and the character of the attack made by Pujo on defendant.

He did not attempt to enter into any detail as to what the statements so made were.

### OPINION.

We have repeatedly said that parties complaining, on an appeal, of the rulings of the District Court refusing to grant a new trial, would be required to make a very strong showing to justify us in reversing its action.

The district judge has seen the witnesses, and heard the testimony throughout, and knows whether a complaint on some particular point, even though well founded, would be of a character such as should outweigh all the other facts and circumstances testified to going to convince him that the verdict was just and right.

Defendant's application for a new trial was based upon the claim that he would show that Strauss and Frazier, State witnesses, had made, out of court, statements contradictory to those they made in court.

Granting that to be true, and that it could be proved, with what propriety could this court send the case back for a new tri 1 when the testimony in the cause, independently of these particular witnesses, might have overwhelmingly established the guilt of the accused?

This court in so doing would, from a partial view, undertake to act .differently from the trial judge, who would have acted advisedly with .the facts of the whole case before him.

Under such circumstances judgments of the upper court would be much more likely to be erroneous than those below.

We see nothing in the vague, indefinite, affidavit of Cullen which would warrant us in reopening the issues.

The special charges which defendant asked to have the court submit .to the jury, if tendered under a special state of facts and with direct reference to such facts, might enunciate correctly the law which .should govern a particular case (State vs. Tucker, 38 Ann., 540), but the court properly declined to give them in manner and form as asked.

They were preceded by no recitals to serve as a predicate for the .same, and unless modified, qualified, and explained, would be utterly wrong (State vs. West, 45 Ann., 18; State vs. Cancienne, 50 Ann., 847; State vs. Harris, 51 Ann., 1105.)

The trial judge has the right, but is not forced to give a charge which requires qualification, limitation, or explanation (State vs. West, 45 Ann., 19; State vs. Jackson, 35 Ann., 769; State vs. Riculfi, .35 Ann., 770).

We do not think appellant's complaint, that the court improperly refused to have testimony received as to the general reputation of the deceased for peace and quiet in the community in which he lived, is placed before us, under such circumstances, as to show it to be well founded.

We have no recitals in the bill as to any of the details of the occurrence which resulted in Pujo's death.

The only fact sworn to is that mentioned by Frazier that "Pujo jumped off the pool table and grabbed Baum around the neck, and Baum ducked out from under his arm, and shoved him down, and said: 'You son of a bitch, I'll kill you,' and he went back in his pocket and got his gun and shot him."

Counsel refers to this "grabbing around the neck" as being an overt act of hostility, but we are not justified in assuming it to have been such. It may well have been, as the Attorney General says (though the fact is not shown by the record), that Pujo being drunk and staggering threw his arms, in his maudlin condition, around the neck of the accused causing the latter to fall into such a violent rage as to make him draw his weapon and shoot.

If that was really the case it would have been entirely out of place to have invoked, as being present, a condition of things which would have warranted the introduction of testimony as to the reputation of the deceased for peace and quiet.

Besides, though the question was asked of Frazier as to what Pujo's reputation for peace and quiet was, it is nowhere charged and averred that he was, in fact, a dangerous character, or so regarded.

The question seems to have been a chance one, and had an answer been allowed *non constat,* that it would have appeared that he was otherwise than peaceable and quiet, and yet upon the bare possibility of a different answer we are urged to send this case back. We think the appellant should have made this refusal of the judge a ground of complaint on application for a new trial, and then showed, by testimony, what kind of a man deceased really was.

The court would, unquestionably, have allowed such testimony at that time to support the bill taken, and we would then have had something more than a mere possibility as to what the answer to a question asked would have been on which to predicate our action.

Defendant complains of the action of the judge in refusing a continuance.

Here again we are called upon to deal with a matter which rests very much upon the discretion of the trial judge.

We are of the opinion that the court was over-technical, and over-exacting, in some of the reasons assigned for this refusal, but some of them are of such a character as to make it impossible for us to afford relief.

Appellant did not make this action of the court one of the grounds for a new trial, but rested upon the original bill of exception taken.

Defendant say he expected to prove by the witness, Johnson, that Pujo had cut him, and asserted that no other witness could prove the fact.

A fact of that kind must have made itself manifest to every one at the time, or immediately after it had occurred.

The record discloses that there were several witnesses present at the time of the shooting.

Had the appellant, on application for a new trial, shown by testimony that he had, in fact, been cut at that time, by some one, and that Johnson had been present when Pujo was killed, he would have fortified his application for a continuance and made some kind of a

showing, but though the case went to trial, we hear nothing of a claim of defendant's having been cut by any one, outside of the application for a continuance.

Again no attempt was made, through the application for a new trial, to prove where Johnson was then; where he had been, and where he could or would, in likelihood, be found.

If the return of the sheriff was incorrect in any way, if Johnson was in the parish when summoned, if he was not a fugitive from justice, but a resident of Calcasieu, or if his residence elsewhere was known, appellant had opportunity to have then established it.

We think he would have been entitled to have established this if he could.

We do not think a sheriff's return on a subpœna carries such force as to cut off parties interested in proving the facts stated therein if they can.

Those facts could have been shown on trial of motion for a new trial *as facts,* independently of being urged as a traverse of the sheriff's return. The more regular course in the earlier stage of the cause would have been to have primarily asked the court to have required of the sheriff a detailed statement of the facts and circumstances on which he based his return, but we by no means say that after this had been done that accused could not have shown, by testimony, the real, actual situation as to the witness.

We do not know, by the record, the exact scope intended of what is called the "traverse to the sheriff's return." Defendant made no complaint so far as we are informed of any want of diligence on the part of the sheriff, nor did he attempt to have a second subpœna issue. He obviously did not know hmself where Johnson was, and was unable to give the sheriff any information about him.

If Johnson was really an important witness in defendant's favor it was unfortunate for him that he could not be found at the trial, but the fact that there is such a witness, and that he is an important witness, would not justify the continuance of defendant's case for an indefinite time to ascertain where he is, and whether and when he could be produced.

Were we to send the case back it would have to be upon the mere possibility that the witness might at some uncertain time in the future be found and produced.

Criminal cases would never come to trial were continuances granted under such conditions.

We find no legal ground upon which to reverse the judgment, it is therefore affirmed.